Filed 7/2/21  P. v. Aguirre CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C085307 |
| Plaintiff and Respondent, | (Super. Ct. No. 10F04114) |
| v. | |
| CARLOS RENEE AGUIRRE, | |
| Defendant and Appellant. | |

A man in a mask walked into a Bank of America with a gun, robbed the branch, and carjacked a bank employee.  He left the mask behind.  A jury found defendant Carlos Renee Aguirre guilty of carjacking and six counts of second degree robbery.  The court sentenced defendant to 30 years, four months in state prison.  Defendant appeals, arguing the court erred in (1) excluding third party culpability evidence; (2) denying his *Marsden* motion;[1] (3) denying his motion for a new trial; and (4) declining to strike his prior

---

[1] *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).

1

conviction under *Romero*.[2]  Defendant also contends remand is required for the trial court to exercise its discretion to strike firearm enhancements.  We shall remand so the trial court may consider exercising its discretion under Penal Code sections 667, subdivision (a) and 12022.53, subdivision (h).[3]  On remand, defendant may also renew his *Romero* motion, denied by the trial court.  In all other respects, we affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

An amended information charged defendant with carjacking, count one (§ 215, subd. (a)) and second degree robbery, counts two through eight (§ 211).  As to each count, the amended information alleged defendant personally used a firearm (§ 12022.53, subd. (b)) and that he had a previous serious felony conviction (§§ 667, subd. (a), 1192.7, subd. (c)) for assault with a firearm (§ 245, subd. (a)(2)), which qualified as a prior strike (§ 667, subds. (c) & (e)(1)).  The trial court granted the prosecution's motion to dismiss count eight.

A jury trial followed.  The following facts and evidence were presented at trial.

**The Incident**

Early one morning on January 22, 2010, a man in a mask walked into a Bank of America branch.  He grabbed the assistant manager, Kelly Cary, from behind and held a gun to her head.  The gunman ordered everyone to the ground.

The gunman jumped up on the counter and pointed the gun at teller Denise Ceja and demanded money.  Ceja complied.  The gunman walked along the counter to teller Elizabeth Mesghina and got money from her.  The tellers put the money, totaling $35,000 to $50,000, in a backpack.

---

[2]  *People v. Superior Court* (*Romero*) 13 Cal.4th 497 (*Romero*).

[3]  All statutory references are to the Penal Code unless otherwise designated.

The gunman jumped down off the counter and went up to Cary. He pointed his gun at her and demanded the keys to her car. Cary gave him the keys.

Bank customer Samuel Arenas testified the gunman jumped over him. Another customer, Erika Figueroa Alvarado, testified the robber quickly jumped up on the counters using his hands and then jumped off the counters. Alvarado did not notice any sign that the gunman was injured, but did not watch his legs after the robbery as he walked out the door.

**Flight and a Mask**

The gunman ran to Cary's Ford Thunderbird and drove away. Michael Smith, who was in the parking lot, saw the gunman run to the car, and called 911. Smith saw the profile of the gunman as he ran toward the car. Smith did not remember if the gunman had a limp. Smith saw the gunman leave his mask on the ground.

Officer Matthew Hubbard arrived, and Smith told him about the Thunderbird. Smith also pointed out the mask, which had been left untouched after the gunman fled. Hubbard took the mask and booked it into evidence. The mask was a black ski mask or beanie with eyehole cutouts.

The Thunderbird was abandoned about a half-mile from the bank. A neighbor testified that about a half-hour after the robbery began, the car stopped abruptly across the street. A young man got out, put on a backpack, and ran away.

**DNA Evidence**

Criminalist Nikki Sewell cut three samples from the recovered beanie/mask to test for DNA. Sewell "used common sense to determine where [she] might best be able to get DNA." The bridge of the nose is often sweaty, so Sewell took a sample from the nose area. To obtain saliva, Sewell took two samples from the mouth area. She marked the samples from the nose and mouth Items C, D, and E.

Item C yielded a partial DNA profile. Item D yielded a mixed DNA profile of two people, with a major and minor contributor. Item E yielded a full DNA profile. Sewell uploaded Item E's profile to a DNA database and obtained a match with defendant.

An officer obtained a buccal reference sample from defendant. Sewell got defendant's DNA profile from the sample. Sewell found Item C's partial profile was consistent with defendant's DNA; Item D's major contributor, from which a partial profile was obtained, was consistent with defendant's DNA; and Item E's full profile was the same. Item E's profile was estimated to randomly occur among unrelated individuals in about one in 80 sextillion African-Americans, one in 11 sextillion Caucasians, and one in 160 quintillion Hispanics.

Sewell testified that, when there are major and minor contributors, a DNA profile does not reveal when each person's DNA was deposited or who wore the item first. Sewell would expect a major contribution from someone who wore the mask, especially around the mouth. Only one allele of DNA on the cuttings did not belong to the defendant. Sewell testified it could have come from a variety of contacts with the mask other than wearing it, such as touching it.

**Description Testimony**

The bank branch manager, Jeremy Couch described the robber as male, based on the voice, about 5 feet 7 inches tall, 140 pounds, wearing a mask, a hoodie, a long-sleeved shirt, gloves, and pants. The mask's eyeholes revealed the robber was lighter skinned, but Couch was unsure if the robber was white. Couch described the weapon as a black automatic handgun, but could not rule out an Airsoft or BB gun.

The teller Mesghina could not tell whether the robber was male or female. The assistant manager Carey testified the robber had a male voice, brown eyes, and was around 5 feet 7 inches tall. Carey, familiar with firearms, described the gun as black and stated it appeared to be real.

4

Bank customer Arenas described the robber as thin and Latino, based on the color of his skin around his eyes. He estimated the robber's height at 5 feet 2 inches, but later stated he could not recall the robber's height. Arenas described the gun as black and similar to the gun the interviewing officer carried.

Customer Alvarado saw the robber's face and profile briefly before he entered the bank. Alvarado saw the robber put on the mask. At the time, Alvarado was checking her cell phone while watching people come into the bank. Alvarado described the robber as a male Mexican, about 5 feet 7 inches tall, 160 pounds, and around 27 or 28 years old. The gun was black and looked heavy and big like a police gun.

Smith, the parking lot witness, described the robber as male, about 20 years old, possibly Hispanic, with short hair, about 5 feet 10 inches tall, medium to skinny in build, wearing a mask pulled up to his forehead, and carrying a full black backpack.

The neighbor who saw the car abandoned described the man who fled from the car as having close-cropped hair, slim, with a medium skin tone.

**Photo Lineup**

Five months after the robbery, a detective showed Alvarado a lineup with photos of six similar people, with defendant's photo taken a month after the robbery in position No. 4. Alvarado pointed to photo No. 6 saying that it depicted the hairline, eyebrows, and eyes similar to the robber's. She did not identify any of the photos as the robber. Alvarado testified that when she viewed the photo lineup the robbery was still fresh in her mind.

At trial, Alvarado first testified she identified the robber in the photo with 100 percent certainty, but subsequently stated she told the detective it was only similar to the robber. Alvarado also testified she had identified the photo in position No. 4; she did not recall it as being in position No. 6.

Alvarado stated the person in position No. 4 was the person she saw putting on the mask outside of the bank; "that's the person that robbed the bank." She denied the reason she identified the photo in position No. 4 at trial was because she saw defendant in court. Alvarado stated she had not noticed him.

The day of the robbery, Alvarado told an officer she would recognize the robber if she saw him again. At the photo lineup she made a similar assertion. At trial, over seven years later, when Alvarado was asked whether defendant was the robber, she stated, "At this point, I wouldn't be able to know."

**Defendant's Cell Phone Records**

A detective testified as an expert in the reading and interpretation of cell phone records and cell sites. A cell phone connects to the cell site with the strongest signal. However, occasionally, if too many calls come into a cell site, some may be bounced to a nearby cell site.

The detective reviewed the records for defendant's phone, which revealed the call's initiating and terminating cell sites, but not cell sites during the call. The morning of the robbery, a call was made from defendant's phone and connected to a cell site a half-mile from the bank. About a half-hour later, two calls were made from defendant's cell phone, connecting to a tower about one and one-half miles from his home and ten miles from the bank.

**Defense Case**

*Defendant's Testimony*

Defendant testified at trial he was 5 feet 6 inches tall and weighed 175 pounds. In 2010, he weighed between 135 and 150 pounds. In 2010, defendant possessed a firearm.

Defendant testified about prior criminal convictions. In 2013, he was convicted of misdemeanor domestic violence against his ex-wife. In 2009, defendant was convicted of driving under the influence (DUI), for which he was sentenced in 2010. When he

6

pleaded guilty to the DUI in February or March 2010, defendant knew he might be required to serve time or pay fines. However, defendant denied robbing the bank to pay for either counsel or fines. He was represented by the public defender's office.

In June 2010, defendant discovered he was a suspect in a robbery. Although he had no specific recollection of exactly what he was doing that day, defendant did not rob the bank on January 22, 2010.

### *Defendant's Injury*

On January 2, 2010, while snowboarding, defendant suffered a severe back injury. He received first aid at the scene and was transported to the emergency room at a nearby hospital. Although he was diagnosed with a lumbar compression fracture, defendant lacked insurance and opted to have friends take him home. Defendant was unable to move unassisted for the first two weeks and was able to move with assistance for the next two weeks. He was unable to work in January 2010 and did not return to work until mid-February 2010.

Defendant conceded that by January 22, 2010, he had recuperated enough to leave home, but did not recall what he was doing on that date. By that date, defendant could drive, walk around, and go into stores, but he could not run. He could get into and out of his truck very slowly. Defendant had medical expenses, but denied robbing the bank to pay for them.

### *Mask/Beanie*

Defendant testified he owned several beanies similar to that recovered by the police at the scene of the robbery. However, his beanies did not have eyehole cutouts. Defendant acknowledged the recovered beanie could be his because it looked like one he owned.

The day of the snowboarding accident defendant was wearing a beanie and had another beanie in his truck. After defendant returned home, he asked his ex-wife to get

his snowboarding equipment out of the truck.  He did not see anyone take his snowboarding equipment with them when they left his home.

### *Ex-wife's Testimony*

Defendant's ex-wife testified she was previously married to defendant and they have two children.  In 2013, she filed a domestic violence complaint against defendant and obtained a restraining order.  At the time of the trial they had been separated for over a year, but still shared custody of their children.

In early January 2010, defendant told his ex-wife he had injured his back and leg in a snowboarding accident.  She was not present when the accident occurred.  After the accident, defendant had trouble standing and walking, so she cared for him.  She helped him out of bed, got him to the bathroom, cooked, and cleaned.

Defendant's ex-wife would arrive at defendant's house around 7:30 a.m. before she went to work at 8:00 a.m., returning around 5:30 p.m.  She continued this schedule for two to three weeks, and then only two to three times a week.  She did not know what defendant did on January 22, 2010, between 7:45 a.m. to 5:30 p.m., because she was at work.

Defendant could not function on his own for about three weeks after the accident. He walked with a limp, but she could not recall on which leg.  She testified defendant suffered from his injuries for about three to four weeks.

Defendant's ex-wife never observed defendant with extra money, nor did she see any guns in his home.  She testified that a few days after she began taking care of him, defendant asked her to get his snowboarding equipment out of his truck.  However, the equipment was not in the truck or in the house.

In 2013, she spoke to a district attorney about the domestic violence incident. When asked about the robbery, defendant's ex-wife said she did not know anything about it.  She did not mention defendant's injuries or her caring for him.  In February 2017,

8

prior to her trial testimony, she spoke to a defense investigator about defendant's injuries and taking care of him in 2010.

### *Defense Investigator*

A defense investigator testified he performed a distance-time driving analysis using Google Maps for three travel routes from where the Thunderbird was found to defendant's home at 9:20 and 9:40 a.m. The analysis yielded three routes: (1) 9.7 miles, with a travel time of between 22 and 40 minutes; (2) 11.2 miles, with a travel time of between 24 and 45 minutes; and (3) 11.4 miles, with a travel time of between 14 and 22 minutes. The defense argued there was insufficient time for defendant to have robbed the bank at 9:26 a.m. and then be back at his house by 9:41 a.m., as shown by the cell phone data.

The investigator testified he did not know if what was reflected on the maps was the same information that would have existed seven years earlier. He also admitted that actual driving times can vary from those produced by Google Maps. Drivers can also speed and break traffic laws to get somewhere faster.

### *Defendant's Phone Records*

Defendant confirmed the cell phone records the detective analyzed were for his phone number, but stated he was not at the bank. The phone was always in his possession; he did not lend it to anyone. He stated that if his phone was out of his home's area in the morning on January 21 and 22, 2010, then he was also in the area, possibly running errands. He might have been traveling in the area but did not know what he was doing.

## Prior Conviction for Assault with a Firearm

In August 1997, following a no contest plea, defendant was convicted of assault with a firearm with personal use of a firearm. (§§ 245, subd. (a)(2), 12022.5, subd. (a).) The offense occurred on September 3, 1996. While one minute order listed defendant's

9

birth date as April 9, 1982, another minute order and the probation report listed his birth date as April 9, 1981, making defendant 15 years and five months old when he committed the offense.

Under the negotiated disposition, defendant was found to be unfit to be tried as a juvenile, despite an earlier finding that he was fit. The offense qualified as a prior serious felony conviction and a prior strike. (§§ 667, subd. (a)(1), 667, subds. (c) & (e)(1).)

**Verdict and Sentencing**

The jury found defendant guilty of counts one through seven and found true the personal use of a firearm allegation as to each count. The court found the prior conviction allegation true.

The court sentenced defendant to 30 years, four months: (1) 20 years on count one, consisting of the middle term of five years, doubled, plus 10 years for the firearm enhancement; (2) the middle term of three years on count two, stayed pursuant to section 654; (3) three years and four months on count three, consisting of one-third the middle term of one year, doubled, plus three years and four months for the firearm enhancement, consecutive; (4) 13 years on each of counts four through seven, consisting of the middle term of three years, plus 10 years for the firearm enhancement, concurrent; and (5) five years for the prior conviction enhancement, consecutive. Defendant filed a timely notice of appeal.

## DISCUSSION

### I

### *Third Party Culpability Evidence*

Defendant sought to present evidence that another man, Jorge Fajardo, committed the robbery. After briefing and a hearing, the trial court found the evidence inadmissible. Defendant argues the trial court's decision violated his constitutional rights.

10

## A.	Background

Defense counsel filed a motion in limine seeking admission of evidence of third party culpability.  The motion stated that Janelle Cobb, who lived near the bank, contacted police on March 31, 2010.  Cobb expressed concern that her baby's father and boyfriend, Jorge Fajardo, might have been involved in the robbery.  The morning of the robbery she witnessed the police response and learned of the robbery.  An officer interviewed Cobb and told her the suspect was a young Hispanic male.

Cobb stated Fajardo had told her before the robbery it would be easy to rob a bank.  Cobb called Fajardo's work and learned he had called in sick the day of the robbery.  He lied to her about going to work and told her not to worry about it.  Cobb also saw police dogs sniffing across the street where Fajardo used to live.  Fajardo changed the lock on her storage unit and did not give her a key.  Fajardo told Cobb he was storing sheet rock in the unit.  She saw him place a duffle bag in the unit, but he would not tell her what was in it.  Cobb tried to get the key by telling him the fire department was going to inspect the unit.  Fajardo cleaned out the unit and again changed the locks.

Cobb spoke with a mutual friend who also expressed concern that Fajardo and his father were involved in the robbery and said they would be robbing three banks.  An officer showed Cobb a still photo of the bank robber from the surveillance video.  She recognized the jacket worn by the robber as one worn by Fajardo when he got cold.  Fajardo also owned a BB gun and she had seen him use a sharpie to make the tip black so it looked real.  Cobb described Fajardo as 5 feet 6 inches to 5 feet 7 inches tall with a medium build and dark hair.

The defense motion concluded:  "The probative value significantly outweighs the prejudicial effect, and said testimony will not significantly delay the trial or confuse the jury.  Ms. Cobb and the detective can attest to what they observed and what follow-up works [*sic*] was done as a result of her statement."

11

In opposition, the prosecution argued: "In the case before the court, defense seeks to admit evidence that through a statement from Janelle Cobb shifting culpability from the defendant to a Mr. Jorge Fajardo. Ms. Cobb is the mother of Mr. Fajardo's daughter, she gives [*sic*] her statement to the police on March 31, 2010, approximately two months after the defendant committed the bank robbery. The statement from Ms. Cobb is largely uncorroborated and tainted by the fact that she states Mr. Fajardo has never given her any money for child support. Ms. Cobb's statement provides no direct or circumstantial evidence to link Mr. Fajardo to the crime."

At the motion in limine hearing, defense counsel explained Cobb lived close to the bank and, after seeing the aftermath of the robbery, contacted police. She told them she might be able to identify the robber. A few days later an officer interviewed Cobb at her home. Cobb said prior to the robbery, Fajardo told her it would be easy to rob a bank and admitted to a mutual friend that he was going to rob a couple of banks. Cobb identified Fajardo in a photograph of the robber, recognizing a sweater he wore with a distinctive emblem. Cobb stated: "He wears that sweater. He has a sweater that looks like that. And he wears it when it's cold and I think it's his sweater. I think it's him."

The court responded: "It does sound, you know, now that you told me that she actually looked at a surveillance video of the incident and then said somebody wearing a sweater with an emblem that matched a sweater that -- so this person is her boyfriend." Defense counsel interjected that Fajardo and Cobb were still together and had a child. The court continued: "Okay. So the sweater that her then boyfriend wore, that's pretty direct evidence that maybe he may have been involved. That's a little different. [¶] What do you think about that, Ms. Mielke [prosecutor]? Although you know what, I think the DNA evidence kind of seals the deal, though."

The prosecutor argued Cobb's statement was largely uncorroborated and tainted by bias since she said Fajardo never paid child support. It failed to link Fajardo to the crime and was speculation based in part on inadmissible hearsay of the friend. The

12

prosecutor also argued the "sweatshirt" Cobb recognized was "a navy blue nondescript sweatshirt." In addition, the prosecutor argued for exclusion under Evidence Code section 352. Relying on *People v. Johnson* (1988) 200 Cal.App.3d 1553 (*Johnson*), the prosecutor further argued third party culpability evidence should not be admitted when other evidence excludes the third party as the perpetrator. Here, the DNA on the beanie worn by the robber contained a full profile match to the defendant.

The court observed that based on "the evidence that she identifies, the person with the sweater . . . but for the DNA evidence, I think the court has to make a finding that the third party culpability evidence is such that it would raise a reasonable doubt of the defendant's guilt." The court added, however, under *Johnson* "I think the DNA evidence linking your client to the commission of the crime I think would knock out the relevance of this third party culpability."

Defense counsel argued there was a mixture of DNA from more than one person on the beanie, the entire beanie was not tested, and the beanie might have been lost or obtained by a third party. According to defense counsel, "the difference here between *Johnson* and this case is, here we have a beanie who no one says there's not one single witness that says we saw the perpetrator take the beanie off and throw it on the ground. It's circumstantial evidence it was found in the area . . . ." The prosecutor countered that all the other samples from the beanie were complete matches with defendant.

The court concluded: "I just don't think that the evidence, even though there may be a motive for [Fajardo] to have done it . . . and he may have had the opportunity, I just don't think it's enough to raise a reasonable doubt as to [defendant's] culpability. And I think particularly in light of the DNA evidence, to me that still seems to be there." The court denied defendant's motion to admit third party culpability evidence.

**B.      Discussion**

Defendant argues the trial court abused its discretion in excluding the third party culpability evidence.  According to defendant, the court violated his constitutional rights to a jury trial and due process in excluding evidence that Fajardo committed the charged offenses.

Only relevant evidence is admissible at trial.  (Evid. Code, § 350.)  Evidence raising a reasonable doubt as to a defendant's guilt, including evidence that a third party committed the crime, is relevant.  Such evidence is admissible if capable of raising a reasonable doubt of a defendant's guilt.  However, evidence that another person had motive or opportunity, without more, is not relevant.  To be relevant, there must be direct or circumstantial evidence linking the third party to the actual commission of the crime.  (*People v. Hall* (1986) 41 Cal.3d 826, 833 (*Hall*).)  In order for third party evidence to be relevant and admissible, the evidence need not show substantial proof the third party committed the crime, but only be capable of raising a reasonable doubt of a defendant's guilt.  (*People v. Ghobrial* (2018) 5 Cal.5th 250, 282-283.)

The trial court may exclude relevant evidence if it creates a substantial danger of prejudicing, confusing, or misleading the jury, or would consume an undue amount of time.  (Evid. Code, § 352.)

We review the trial court's exclusion of evidence for an abuse of discretion. (*People v. Chism* (2014) 58 Cal.4th 1266, 1291.)

Defendant presents this interpretation of the third party evidence:  "But here Cobb provided evidence which directly and circumstantially connected Fajardo to the actual perpetration of the crime.  Cobb not only provided direct evidence that Fajardo was the gunman, but she also provided substantial circumstantial evidence that Fajardo was the perpetrator of the bank robbery.  The excluded defense evidence showing that Fajardo committed the charged offenses thus raised a reasonable doubt of [defendant's] guilt because the prosecution's evidence showed only a single, lone perpetrator of the bank

14

robbery and carjacking. In other words, if Fajardo was the gunman—as shown by Cobb's statement—then [defendant] was necessarily excluded."

The trial court carefully considered the evidence of Fajardo's culpability for the crimes charged against defendant. The court specifically referenced Cobb's identification of the sweater worn by the robber in the video, finding the identification, considered in isolation, would raise a reasonable doubt of defendant's guilt. The evidence also revealed Fajardo may have had motive and opportunity to commit the robbery. However, the court concluded: "I think the DNA evidence linking your client to the commission of this crime . . . would knock out the relevance of this third party culpability." In reaching this conclusion, the court cited *Johnson*.

In *Johnson*, the defendant was charged with a series of robberies and was convicted, based in part, on the fact his fingerprints were found at the robbery scenes and on the stolen property. (*Johnson, supra*, 200 Cal.App.3d at pp. 1556-1558.) The defendant sought to introduce evidence of a third party as the robber. (*Id.* at p. 1564.) The appellate court affirmed the trial court's refusal to admit the evidence. The court found "even the strongest circumstantial evidence case of third party culpability does not raise a reasonable doubt about a defendant's guilt when fingerprints found at the scene of the crime could not have been those of a third party . . . Simply put, [defendant's] evidence raised a possibility that the prosecution's evidence made an impossibility. As his proffered evidence could not logically raise a reasonable doubt about his guilt, the trial court properly excluded it." (*Id.* at p. 1564.)

The reasoning of *Johnson* has been called into question by *Holmes v. South Carolina* (2006) 547 U.S. 319 [164 L.Ed.2d 503]. *Holmes* held that an evidentiary rule that precluded a defendant from introducing third party culpability evidence when there was strong evidence of his guilt violated his federal constitutional rights to a fair trial and to present a defense. (*Id.* at pp. 330-331.) The California Supreme Court in *People v. Page* (2008) 44 Cal.4th 1, 37, footnote 16, acknowledged the potential impact of *Holmes*.

15

Here, the trial court did not indicate it was bound by *Johnson* or that case was decisive in the court's exclusion of third party culpability evidence, notwithstanding the court's comments regarding *Johnson* and the strength of the DNA evidence. Instead, the court made the proper inquiry as to whether evidence of third party culpability could raise a reasonable doubt as to defendant's guilt. (See *Hall, supra*, 41 Cal.3d at p. 834.) "I just don't think that the evidence, even though there may be a motive for [Farjado] to have done it . . . and he may have opportunity, I just don't think it's enough to raise a reasonable doubt as to [defendant'] culpability."

Defendant argues "the DNA evidence merely showed that [defendant] had contact with the beanie at some point, which was not disputed. Moreover, the DNA evidence did *not* eliminate Fajardo as a possible perpetrator of the bank robbery." However, the DNA evidence, coupled with defendant's cell phone records, various witnesses' descriptions of the robber, and Alvarado's identification of defendant, provided strong evidence of defendant's guilt.

The court did not abuse its discretion in concluding that the introduction of the third party evidence would not have raised a reasonable doubt about defendant's guilt. "When a trial court exercises its discretion to exclude evidence and does not abuse that discretion, the exclusion of evidence (including proffered third party culpability evidence) does not impermissibly infringe on a defendant's federal constitutional rights." (*People v. Shorts* (2017) 9 Cal.App.5th 350, 358-359.)

## II

### *Marsden Motion*

Defendant contends the trial court erred in denying his request for substitute counsel following the verdicts, because, during his *Marsden* hearing, defendant made a showing that his right to counsel had been substantially impaired. Defendant focused on four areas of ineffective assistance of counsel: failure to obtain and present defendant's

16

hospital records; delay in obtaining defendant's ex-wife's statement; failure to impeach Alvarado with surveillance videos; and poor communications between defendant and counsel.

## A. Background

After the jury returned its verdicts, defendant moved for appointment of new counsel to file a motion for a new trial, based in part on a claim of ineffective assistance of counsel. The court held a *Marsden* hearing, at which defendant presented the following objections to defense counsel's representation.

### *Hospital Records*

Defendant argued defense counsel failed to obtain and present hospital records of his snowboarding injury to support his testimony that he would have been incapable of jumping on the bank counter or running to the parking lot. The jury was unable to examine the records, hear from the treating physician, or see the X-rays of his lumbar injury. The records were also relevant to corroborate his testimony and rebut the prosecution's suggestion that defendant lied about going to the emergency room.

Defense counsel testified he had subpoenaed the ski patrol records and the hospital records, but never received the latter. As to the hospital records, defense counsel stated: "[W]e sent everything we needed to them . . . and they never arrived to the Court. And the clerk indicated to me that the address was the home court as opposed to the H Street address here. [¶] We re-subpoenaed them again and they never showed up."

Defense counsel explained: "My concern, my main concern with this trial was not the hospital records, but the DNA evidence, and then later on when the district attorney discovered the phone records, that also became my main concern, because those two bits of evidence put my client at the scene. His phone pinging by the phone tower and his DNA on the ski mask. [¶] So that was, for lack of a better term, the 800-pound gorilla in the room I had to deal with. Hospital records were key to the point where it indicates that

17

my client did go to the hospital that day, but as per his statement, he was there but then he left without consent of the doctor. He just up and left the emergency room."

In addition, defendant told defense counsel he did not see a doctor afterwards. "So although [the records] were . . . important to prove that there was an injury before the robbery, I had nothing to prove that he was still injured at the time of the robbery other than [defendant's ex-wife's] testimony." Defense counsel also noted the ski resort records, which verified defendant's injury, were admitted into evidence.

### Ex-wife's Statement

According to defendant, defense counsel waited for over six years before interviewing his ex-wife about defendant's injury. The delay allowed the prosecution to discredit her testimony.

Defense counsel stated he had spoken with defendant's ex-wife several times over the phone. He thought, wrongly, that she had been interviewed by the public defender's office. She had been represented by the public defender's office and appeared on a list of witnesses defendant had given him. When defense counsel learned she had not been interviewed, around the time of jury selection, he sent an investigator to interview her.

### Failure to Impeach Alvarado

Defendant contended defense counsel failed to impeach Alvarado with surveillance video that showed she was looking at her cell phone before and after the robber entered the bank, preventing her from seeing the robber's face.

Defense counsel stated, as Alvarado testified, he looked again at the surveillance videos. In one video, Alvarado looked towards the bank's front doors, corroborating her testimony that she saw the robber enter the bank. According to defense counsel "my trial strategy at that point that she was the only individual in the bank that got a good look at the individual's face and was unable to identify my client shortly thereafter [in the photo

18

lineup]. [¶] . . . I wanted to paint her in a light that she was telling the truth, that she was unable to recollect who it was that was in there, but she did get a good look at the guy."

Defense counsel explained he had viewed different video angles prior to and during trial. He pointed out to defendant that Alvarado was looking at the door when the robber entered: "So, therefore, she did get a good look at the guy but still was unable to identify [defendant] in the photographic lineup. So unfortunately, when she comes to court now, she sees [defendant] here in court, and I believe that her identification in court now was based on the fact that he is in the defendant's chair and not because that is the individual who she recalls seeing at the bank."

### Communications Between Defense Counsel and Defendant

Defense counsel stated communications between him and his client were "adequate and substantive" and that they "communicated well." Defendant acknowledged, "We do have a good rapport."

### Trial Court's Ruling

The court determined defense counsel's performance did not fall below the constitutionally required standard of legal representation. The court reasoned: "And even if he had committed errors . . . I don't think that . . . anything that [defense counsel] did or failed to do would have resulted in a different result, such that I can say that my confidence in the verdict is undermined or called into any kind of serious question," based on the strength of the evidence against defendant. The court cited the DNA evidence, the cell tower records, and Alvarado's in-court identification of defendant's photo as "all very powerful evidence."

As for the medical records, the trial court stated: "I don't think those medical records would have made any difference in this case, given all the other evidence. [¶] I think his testimony and that of [his ex-wife] that he was injured, was sufficient to have established the nature and extent of his injuries. And the issue and extent to which those

19

injuries, if they were as he claimed, would have impeded or made it impossible for him to jump over the bank counter as he's indicated."

The court found the relationship between defendant and defense counsel had not broken down: defense counsel indicated "they communicated adequately, regularly, and substantively." The court also noted defendant admitted "he had a pretty good rapport" with defense counsel.

The court denied the *Marsden* motion and denied defendant's request for new counsel. Defendant reiterated his claim that his relationship with defense counsel was in ruins. He argued defense counsel misled him about the progress of his defense. Defense counsel minimized the significance of his hospital records during the hearing, in stark contrast to counsel's earlier statements about the importance of the records. The court disagreed, again finding no "breakdown such as to justify granting a *Marsden* motion, so I'm not granting it."

## B.    Discussion

*Marsden, supra*, 2 Cal.3d 118 established the right of a criminal defendant to make a motion to discharge court appointed counsel and substitute new counsel. Under *Marsden*, a defendant who makes such a motion must be allowed to state the specific reasons for his or her dissatisfaction with currently appointed counsel. (*Id.* at pp. 123-124.)

If the defendant establishes that his or her right to counsel has been substantially impaired, substitute counsel must be appointed. (*People v. Sanchez* (2011) 53 Cal.4th 80, 90.) Substantial impairment can be established in two ways: when the attorney is providing constitutionally substandard representation, or when the defendant and defense counsel have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result. (*People v. Clark* (2011) 52 Cal.4th 856, 912.) Appointment of new counsel is appropriate in the face of an irreconcilable conflict

20

between a defendant and defense counsel because such a conflict is fatal to an effective attorney-client relationship. (*People v. Ortiz* (1990) 51 Cal.3d 975, 984.) In determining whether such a destructive conflict exists, we consider the degree of hostility and the impact such hostility has on communication between the defendant and defense counsel. (*Hudson v. Rushen* (9th Cir. 1982) 686 F.2d 826, 832; *People v. Daniels* (1991) 52 Cal.3d 815, 843.)

We review the trial court's denial of a defendant's *Marsden* motion for abuse of discretion. We do not reverse unless the defendant has shown the trial court's failure to replace counsel substantially impaired the defendant's right to assistance of counsel. (*People v. Taylor* (2010) 48 Cal.4th 574, 599.) When reviewing whether the trial court abused its discretion, we consider whether it made an adequate inquiry into the defendant's complaints. (*People v. Mungia* (2008) 44 Cal.4th 1101, 1127-1128.)

To establish ineffective assistance of counsel, a defendant must show counsel's performance was deficient and fell below an objective standard of reasonableness, and it is reasonably probable that a more favorable result would have been reached absent the deficient performance. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688 [80 L.Ed.2d 674, 693.]) A reasonable probability is a "probability sufficient to undermine confidence in the outcome." (*Id.* at p. 694.)

Defendant argues the medical records were integral to his defense, that his debilitating back injury prevented him from being physically able to jump up and down on the counter as the robber did. In addition, defendant points out that the prosecutor noted the lack of hospital records during closing argument: "So yes, there was an accident at Boreal, but the evidence shows he refused treatment. The evidence shows that he left and did not go to the ER. If he'd gone to the ER, we would have those medical records. If he had gotten x-rays and had a serious lumbar fracture, I think he said, we'd see some x-rays. We'd see some medical proof. We'd see a diagnosis. [¶] All we have is a ski patrol report. There's no evidence that three weeks later he had a

21

limp. The defendant himself said when he testified that by January 21st and 22nd, 2010 he'd recuperated enough that if he had to go some place, he could go. He could make it to court, he could go run errands, he could get in and out of his Chevy Silverado truck. [¶] The reason why, there's no evidence the defendant had a limp or serious, severe injury that would have prohibited him from committing this offense because it didn't exist. It's not true."

Defense counsel testified he twice subpoenaed the hospital records, but they never arrived. The records would show defendant was injured, but also that defendant left the hospital without receiving treatment and received no followup treatment. The ski resort records, which were admitted into evidence, stated defendant had been injured in the snowboarding accident. As the trial court noted, defendant and his ex-wife both testified as to the nature and extent of defendant's injuries. Both stated defendant could not have made the moves made by the robber.

Defendant argues only the hospital records established the type and severity of the injury and without the records "the jury was left with the false impression that [defendant] suffered only a minor injury at the ski resort, and left without seeking medical attention." We disagree. The missing hospital records would only have added more evidence that defendant suffered an injury, not that he was still injured at the time of the robbery, or the extent of the injury at the time of the robbery.

As for defense counsel's delay in obtaining defendant's ex-wife's statement, defendant contends the delay undermined her credibility and the prosecution suggested it was fabricated. Defendant also labels defense counsel's delay "devastating." However, once defense counsel realized she had not been interviewed he swiftly moved to rectify the situation. We agree with the trial court's assessment it was an honest mistake, which did not substantially impact defendant's case.

Defendant also faults defense counsel for failing to use bank surveillance videos to impeach Alvarado's testimony that she saw the robber's face before he put on the mask

22

and entered the bank. According to defendant, the videos reveal a side-view of Alvarado that show her looking at her cell phone for at least 22 seconds before the robber entered the bank. Defendant contends, "The bank surveillance videos thus contains material evidence impeaching Alvarado's testimony. [Defense counsel's] failure to use the bank surveillance videos to impeach Alvarado's testimony – and his mistaken understanding of what the videos showed – severely undercut [defendant's] defense of actual innocence . . . ."

Defense counsel explained his trial strategy of showing Alvarado was the only person in the bank to see the robber's face and that she could not identify defendant as the robber shortly afterward. Although at trial Alvarado identified defendant as the robber after seeing him in the courtroom, the latter identification does not invalidate defense counsel's initial strategy. The fact counsel's trial strategy was not successful does not make counsel ineffective. We do not second-guess defense counsel's tactical decision in retrospect. (*People v. Cox* (1991) 53 Cal.3d 618, 656; *People v. Wallin* (1981) 124 Cal.App.3d 479, 484-485.)

The trial court did not err in denying defendant's *Marsden* motion.

### III

### *Motion for a New Trial*

In a related claim, defendant argues the trial court erred in denying his motion for a new trial based on ineffective assistance of counsel. Much of our preceding analysis also applies to this claim.

### A.    Background

After the court denied his *Marsden* motion, defendant proceeding in pro. per. filed a motion for a new trial based on ineffective assistance of counsel. Defendant again cited defense counsel's failure to present his hospital records, delay in obtaining defendant's ex-wife's statement, and failure to impeach Alvarado with bank surveillance videos. The

23

court held a hearing and heard testimony from both the defense investigator, defense counsel, and defendant.

The trial court denied the motion. According to the court, defense counsel's performance was not deficient "applying objective standards of reasonableness under prevailing professional norms." Instead, counsel's performance "fell well within that standard." The court found the evidence implicating defendant very strong, citing the DNA samples on the beanie, cell phone records, and Alvarado's in-court identification. As to Alvarado's testimony, the court noted there were some questions about the identification, "but all that was put to the jury."

The court also determined the medical records were of "marginal relevance." The records would have established defendant's original injury, not his exact condition the day of the robbery. Defendant and his ex-wife both testified about his injuries at the time of the robbery.

**B.    Discussion**

Ineffective assistance can provide the basis for a new trial based on the constitutional duty of trial courts to ensure defendants are accorded due process. (*People v. Callahan* (2004) 124 Cal.App.4th 198, 209.) We review the denial of a motion for a new trial de novo but defer to the trial court's factual findings if they are supported by substantial evidence. (*People v. Albarran* (2007) 149 Cal.App.4th 214, 224-225.)

Defendant's request for a new trial was based on defense counsel's errors set forth in his *Marsden* motion: failure to obtain medical records, delay in obtaining his ex-wife's statement; and failure to impeach Alvarado with surveillance video. Defendant agrees much of the evidence presented in connection with the *Marsden* motion is relevant to the new trial motion, but asserts additional evidence was presented in the latter proceeding.

24

However, the supplemental evidence defendant presented on the new trial motion added little to the evidence set forth in the *Marsden* hearing. Regarding the medical records, defendant testified that, "When I met [defense counsel] in 2011 we discussed the case, we discussed the defenses that we would present based upon all the discovery and my injury. We did in fact plan a medical defense. [¶] I gave [defense counsel] all the information he needed to obtain the medical records which are indicated in his notes that are made part of the exhibits. He wrote down the hospital name, he wrote down who I went with to Boreal ski resort. And he assured me many a times throughout the six years that he was my attorney that he would have the medical records for trial, he would have the treating doctor testify at trial. And like I said, we had this conversation numerous, numerous times."

Defense counsel also acknowledged that his delay in obtaining defendant's ex-wife's testimony regarding defendant's injuries was used by the prosecution to impeach her testimony.

However, this additional evidence does not change our conclusion, in connection with defendant's *Marsden* motion, that defendant failed to show defense counsel's performance was ineffective. The trial court did not abuse its discretion in denying defendant's motion for a new trial.

## IV

### *Firearm Enhancements*

Defendant also requests remand for the trial court to determine whether to exercise its new discretion to strike the firearm enhancements. The People agree remand is appropriate.

### A.    Background

The jury found true that during the commission of the offenses in counts one through seven, inclusive, defendant personally used a firearm. (§ 12022.53, subd. (b).)

25

The court did not strike any of the firearm enhancements, but instead imposed sentence on the firearm enhancements, which included terms of 10 years on count one and three years four months on count three, plus stayed and concurrent terms on the remaining firearm enhancements.

Effective January 1, 2018, section 12022.53, subdivision (h), was amended to provide: "The court may, in the interest of justice pursuant to Section 1385 and at the time of sentencing, strike or dismiss an enhancement otherwise required to be imposed by this section. The authority provided by this subdivision applies to any resentencing that may occur pursuant to any other law." Defendant contends the amendment should apply retroactively. The People agree.

## B.     Discussion

In order to avoid remand, the record must clearly indicate the sentencing court would not have exercised its discretion to lessen the sentence. (*People v. Askey* (1996) 49 Cal.App.4th 381, 389; *People v. Gutierrez* (1996) 48 Cal.App.4th 1894, 1896.) Although the People note some of the court's comments during sentencing on the firearm enhancements "make it unlikely that it would have exercised its discretion to strike *all* of the firearm enhancements, it is unclear whether the court would have chosen to strike *some* of them if it had known that it had the discretion to do so." Accordingly, we remand to allow the trial court to exercise its discretion to strike defendant's firearm enhancements pursuant to section 12022.53.

## V

### *Defendant's Prior Conviction*

Defendant, in pro. per., filed a motion under *Romero, supra*, 13 Cal.4th 497, to strike his prior felony conviction for assault with a firearm when he was 14 years old. (§ 245, subd. (a)(2).) Defendant argues the trial court abused its discretion in denying the motion.

## A.     Background

In considering defendant's motion, the trial court noted defendant was "just over 14" and the juvenile court originally found defendant fit for juvenile court. However, the juvenile court later found defendant unfit as part of the plea agreement, which was how it became an adult conviction. The court stated: "It does look strange but it required a plea deal that was negotiated by the People, the district attorney, and your attorney. You had legal representation throughout the entire process."[4] The court noted its familiarity with the public defender who represented defendant and whom he considered very experienced.

The court explained its reasoning in denying defendant's *Romero* motion: "I reviewed the *Romero* motion that we were just discussing relating to the circumstances of the strike prior, and I've taken all of that into account. I've also looked at the purposes behind the three strikes scheme laid out in the rules of the court. [¶] I have decided that I am going to deny the *Romero* motion. I want to go over some factors in terms of why I decided what I did. [¶] . . . I'm allowed to consider [that] . . . the current offense is a violent felony. [¶] . . . [T]he facts of this case and the circumstances indicate a . . . greater danger to society given the fact that a gun was used. [¶] The defendant was convicted in this case of multiple counts. A weapon was involved. There were no, as far as the Court's aware, there were no physical injuries to . . . any of the victims in the case. Nonetheless . . . the . . . victims appeared to have suffered psychological harm as a result. There was a financial loss to the [the bank]. [¶] . . . [¶] . . . Now the defendant, Mr. Aguirre, has a criminal record going back to even when he was a minor. The Court

---

[4] The juvenile court, in its fitness determination, stated: "I find this to be a close case. I think that it's a case about which people can disagree. It's a case in which I certainly would not be critical of anyone if they found that the minor was not a fit and proper subject to be dealt with under the juvenile court law."

sustained and found true a strike prior. [¶] So given all of those factors and recognizing again I understand the argument he made regarding that strike prior, but I find given the nature and circumstances of the present felonies, that he was convicted of his prior convictions, his background, character, prospects, the defendant has been in and out of custody now for a number of times over the last 15, 20 years, I think that it would be hard for me to deem him to fall outside of the spirit, not to mention the letter, of the three strikes sentencing law . . . to justify striking the strike."

**B.      Discussion**

Defendant presents two arguments in support of remand on the *Romero* issue. First, defendant argues the trial court abused its discretion by refusing to strike his prior single strike conviction, which arose from conduct when he was 14 years old. Second, defendant argues under the "full sentencing rule," if his case is remanded for resentencing the trial court should also consider his *Romero* motion. The People agree remand is appropriate under the latter argument. We agree.

In *People v. Garner* (2016) 244 Cal.App.4th 1113, we held that, when a case is remanded for resentencing by the Court of Appeal, the trial court is entitled to consider the entire sentencing scheme. The court is not limited to merely striking the illegal portions, but may reconsider all sentencing choices. We found such a result justified because an aggregate prison term is not a series of separate terms, but one term made up of interdependent components. Therefore, the invalidity of one component infects the overall scheme. (*Id.* at p. 1118; *People v. Buycks* (2018) 5 Cal.5th 857, 893 [citing *Garner*].)

Since we remand for resentencing on other grounds, we authorize defendant to renew his *Romero* motion.

28

# VI

## *Supplemental Briefing*

In supplemental briefing, defendant requests remand for the trial court to exercise its discretion to strike or dismiss the five-year serious felony prior enhancement under amended section 667, subdivision (a). The trial court imposed a consecutive term of five years for the prior serious felony enhancement. Again, the People agree remand is appropriate.

Section 667, subdivision (a)(1), provides a five-year enhancement for a prior serious felony conviction when a defendant is currently convicted of a serious felony. Under prior law, the trial court had no discretion to strike an enhancement under the statute. Former section 1385, subdivision (b) stated: "This section does not authorize a judge to strike any prior conviction of a serious felony for purposes of enhancement of a sentence under Section 667." In September 2018 the law changed, ending the limitation on sentencing discretion by removing subdivision (b), effective January 1, 2019. (See Stats. 2018, ch. 1013, §§ 1, 2.)

The parties agree the amendment is retroactive under *In re Estrada* (1965) 63 Cal.2d 740. Remand for resentencing is not required if the record shows a trial court clearly indicated at the original sentencing it would not have stricken the enhancement even if it possessed the discretion. "The trial court need not have specifically stated at sentencing it would not strike the enhancement if it had the discretion to do so. Rather we review the trial court's statements and sentencing decisions to infer what its intent would have been." (*People v. Jones* (2019) 32 Cal.App.5th 267, 273.)

Defendant argues there is no evidence in the record establishing that the trial court would not have exercised its discretion to strike the five-year prior serious felony enhancement if it had the discretion to do so at the time defendant was sentenced. The

29

People do not dispute this gloss on the evidence. Accordingly, we remand for the trial court to exercise its discretion to strike the five-year prior serious felony enhancement.

## DISPOSITION

We remand to allow the trial court to consider exercising its sentencing discretion under section 12022.53, subdivision (h), and section 667, subdivision (a). Since we remand for resentencing on other grounds, we authorize defendant to renew his *Romero* motion. If appropriate, the trial court is directed to prepare an amended abstract of judgment and forward a certified copy to the Department of Corrections and Rehabilitation. The judgment is otherwise affirmed.

_____/s/_____
RAYE, P. J.

We concur:

_____/s/_____
ROBIE, J.

_____/s/_____
MAURO, J.

30